Lisa Kay McDONNELL,
Petitioner, Respondent,

v.

COMMISSIONER OF PUBLIC
SAFETY, Appellant.

Cindy Jean MOSER,
Petitioner, Respondent,

v.

COMMISSIONER OF PUBLIC
SAFETY, Appellant.

Troy Eugene WEEDING,
Petitioner, Respondent,

v.

COMMISSIONER OF PUBLIC
SAFETY, Appellant.

STATE of Minnesota, Appellant,

v.

Keith Arnold DRIVER, Respondent.

STATE of Minnesota, Appellant,

v.

Michael Joseph McCAULEY,
Respondent.

Nos. C6–90–53, C7–90–224, C1–90–249,
C5–90–478 and C0–90–842.

Court of Appeals of Minnesota.

Oct. 2, 1990.

Review Granted Nov. 9, 1990.

364

Jeffrey S. Sheridan, Inver Grove Heights, for petitioner, respondent McDonnell.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., Joel A. Watne and Jacquelyn E. Albright, Joseph Plumer, Sp. Asst. Attys. Gen., St. Paul, for appellant Com'r of Public Safety.

Steven J. Meshbesher, John J. Leunig, Meshbesher Birrell & Dunlap, Ltd., Minneapolis, for petitioner, respondent, Moser.

Theodore D. Dooley, Minneapolis, Steven L. Bergeson, Bergeson, Lander & Megarry,

P.A., Bloomington, for petitioner, respondent, Weeding.

Dean S. Grau, Minneapolis, Robert J. Patient, St. Paul, for respondent Driver.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., Joseph Plumer, Sp. Asst. Atty. Gen., St. Paul, James T. Reuter, Chisago County Atty., Center City, Michael E. Molenda, Annette M. Margarit, Severson, Wilcox & Sheldon, P.A., Apple Valley City Attys., Apple Valley, for appellant State.

David G. Roston, Segal & Roston, Minneapolis, for respondent, McCauley.

## OPINION

FOLEY, Judge.

These appeals were combined for purposes of oral argument. They present constitutional challenges to the criminal refusal statute and the implied consent advisory. Minn.Stat. § 169.121, subd. 1a, § 169.123, subd. 2(b) (Supp.1989). The trial courts in the individual cases found the statutes unconstitutional, on differing grounds and either dismissed the criminal prosecutions or rescinded the driver's license revocations. We reverse and remand for further proceedings in each case.

## FACTS

The facts of each of these individual cases are of limited relevance to the constitutional and statutory issues presented. There is, for example, no issue as to the legality of the investigative stops, or the officers' compliance with the statute in reading the implied consent advisory. We state the facts only briefly to describe the trial court decisions and to frame the discussion which follows.

### State v. McCauley

Michael Joseph McCauley was stopped after allegedly being clocked driving at over 80 mph. The police report states McCauley admitted having had three beers.

He refused to take the portable breath test, and after being read the advisory, he refused testing.

McCauley was charged with gross misdemeanor DWI, gross misdemeanor refusal, misdemeanor DWI and speeding. He moved to dismiss the refusal charge on constitutional grounds. The trial court granted the motion to dismiss, holding that the implied consent advisory and the criminal refusal statute were unconstitutionally vague, but rejecting McCauley's other constitutional arguments. The state appeals.

### State v. Driver

Keith Arnold Driver was allegedly stopped for speeding. After allegedly failing the field sobriety tests and the portable breath test, Driver was read the implied consent advisory in the squad car and refused to take a breath test.

Driver was charged with two counts of gross misdemeanor DWI and one count of gross misdemeanor refusal. He moved to dismiss for lack of probable cause, and moved to dismiss the refusal charge based on the unconstitutionality of the statute. The trial court denied the motion to dismiss for lack of probable cause, but granted the motion to dismiss the refusal charge. The state appeals.

### McDonnell v. Commissioner of Public Safety

Lisa Kay McDonnell was stopped by an officer who observed her driving erratically. The officer observed indicia of intoxication and arrested McDonnell for DWI. He transported her to the police department, and read her the implied consent advisory. McDonnell refused to submit to testing and her driver's license was revoked. She petitioned for judicial review.

After a hearing, the trial court found McDonnell understood the advisory and made a knowing refusal. The court held, however, that the officer should have determined whether McDonnell had a prior revocation that would subject her to the criminal refusal law. If she did not, ruled the trial court, there was no need to advise her that refusal may subject her to criminal

penalties. If she did, the officer should have advised her of the potential penalty and the right to counsel. The trial court held that failure to do so violated McDonnell's fifth amendment rights and found that the new law added more confusion to the advisory. It rescinded the revocation. The Commissioner of Public Safety appeals.

### Moser v. Commissioner of Public Safety

An officer stopped Cindy Jean Moser in her vehicle when he saw it swerving within the traffic lane. After observing indicia of intoxication, he arrested her for DWI. The implied consent advisory was read to Moser. She testified she was confused by the language of the advisory and asked the officer to re-read certain paragraphs to her. Moser and the officer spent approximately 11 minutes discussing the advisory, after which she agreed to take a test. She testified that had she not thought she was subject to criminal prosecution, she would have refused to take the test. The test showed an alcohol concentration of .13, and Moser's license was revoked pursuant to the implied consent law. She petitioned for judicial review.

The trial court found that Moser, who had no prior revocations, was confused by the language of the advisory. It held that the implied consent advisory was a misstatement of law as applied to Moser, which prevented her from voluntarily consenting to the test and rendered the advisory ineffective. The trial court rescinded the revocation. The Commissioner of Public Safety appeals.

### Weeding v. Commissioner of Public Safety

An officer stopped Troy Eugene Weeding after noticing erratic driving. He then observed Weeding exhibit indicia of intoxication, and arrested him for DWI. The officer read the implied consent advisory to Weeding and asked him if he understood. Weeding replied "sure," but refused to take a test. Weeding had a prior license revocation.

Weeding's driver's license was revoked for refusing testing, and he petitioned for judicial review. The trial court, in an extensive memorandum, ruled that Weeding's fifth amendment rights, sixth amendment rights, and fourteenth amendment due process and equal protection rights were not violated. However, it rescinded the revocation on the grounds that the advisory was a misstatement of law and misleading because it did not fully inform Weeding of his rights and the consequences of refusing testing. The Commissioner of Public Safety appeals.

## ISSUES

1. What is the effect of Minn.Stat. § 169.121, subd. 1a (Supp.1989) on the supreme court's interpretation of a driver's fifth and sixth amendment rights in *Nyflot v. Commissioner of Public Safety*, 369 N.W.2d 512 (Minn.), *appeal dismissed*, 474 U.S. 1027, 106 S.Ct. 586, 88 L.Ed.2d 567 (1985)?

2. Is the language of the implied consent advisory or the criminal refusal statute void for vagueness or so misleading as to compel rescission of a driver's license revocation?

3. Does either the advisory or the criminal statute violate equal protection?

## ANALYSIS

### INTRODUCTION

The United States Supreme Court very recently spoke on the issue of drunk driving: "No one can seriously dispute the magnitude of the drunk driving problem or the States' interest in eradicating it." *Michigan Dep't. of State Police v. Sitz,* —— U.S. ——, ——, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990). The Minnesota Supreme Court and this court also have recognized that "drunken drivers pose a severe threat to the health and safety of the citizens of Minnesota." *Heddan v. Dirkswager,* 336 N.W.2d 54, 63 (Minn.1983); *State v. Muzik,* 379 N.W.2d 599, 602 (Minn. App.1985). In response to this serious problem the legislature has enacted strict laws. *Szczech v. Comm'r of Public Safe-*

*ty,* 343 N.W.2d 305, 306 (Minn.App.1984). The courts have repeatedly recognized these are remedial statutes that must be liberally interpreted in favor of the public interest and against the private interest of the drivers involved. *State, Dep't of Public Safety v. Juncewski,* 308 N.W.2d 316, 319 (Minn.1981). It is in light of these problems and principles that we analyze the issues presented today.

Many challenges to the criminal refusal statute and the corresponding amendment to the implied consent advisory have come to this court. *See* Minn.Stat. § 169.121, subd. 1a, § 169.123, subd. 2(b). In order to address the statutes in an expedient manner, five cases were selected that raised various challenges to the statutes. Though not consolidated, these cases were orally argued together, and we decide them today.

### I.

#### A. *Sixth Amendment*

 The sixth amendment right to counsel attaches only to a critical stage of a criminal prosecution, beginning at the point when formal judicial proceedings commence. *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). The United States Supreme Court has identified the starting point of criminal proceedings as the complaint, preliminary hearing, or arraignment. *Id.* In *Nyflot,* the Minnesota Supreme Court held that the sixth amendment right to counsel does not attach at the time a driver is given the implied consent advisory because formal judicial proceedings have not, at that point, begun. *Nyflot,* 369 N.W.2d at 516. The criminal refusal statute does nothing to hasten the stage of formal charging.

In *Nyflot,* the supreme court noted Justice Rehnquist's statement in *United States v. Gouveia,* 467 U.S. 180, 188 n. 5, 104 S.Ct. 2292, 2297 n. 5, 81 L.Ed.2d 146 (1984), indicating that custodial interrogation was the

only arguable deviation from the usual rule that the sixth amendment right to counsel is not triggered until the com-

mencement of adversary judicial proceedings.

*Nyflot*, 369 N.W.2d at 516. The United States Supreme Court has consistently followed this position in later decisions. *See Moran v. Burbine*, 475 U.S. 412, 431–32, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986) (no sixth amendment right to counsel when attorney attempted to contact uncharged suspect undergoing custodial interrogation); *see also Maine v. Moulton*, 474 U.S. 159, 170, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985) (right attaches after the initiation of adversary criminal proceedings).

A driver arrested and read the implied consent advisory has neither been charged nor arraigned. The addition of the criminal sanction for refusal does not make the advisory stage itself an "adversary judicial criminal proceeding[ ]." *Gouveia*, 467 U.S. at 189, 104 S.Ct. at 2298. The implied consent advisory previously warned the driver of possible criminal liability if he failed the test. *See* Minn.Stat. § 169.123, subd. 2(b)(3) (1988). The attachment of criminal sanctions to the other choice, refusal, does not make the advisory an adversarial proceeding.

A state court may interpret its own constitutional provision more expansively than a similar or identical provision in the United States Constitution. *See, e.g., State v. Hamm*, 423 N.W.2d 379, 382 (Minn.1988). However, the supreme court has recognized a broader right to counsel than required by the federal constitution only under the supreme court's supervisory power and not under a broader state constitutional analysis. *See State v. Nordstrom*, 331 N.W.2d 901, 904–05 (Minn.1983); *Hepfel v. Bashaw*, 279 N.W.2d 342, 348 (Minn.1979). This court will not extend the state constitutional right to counsel beyond the bounds recognized by the supreme court.

#### B. *Fifth Amendment*

##### 1. Federal Constitution

■ The fifth amendment to the federal constitution provides that: "No person * * * shall be compelled in any criminal case to be a witness against himself." The procedural safeguards under the fifth amendment, including the right to an attorney, are meant to secure the privilege against self-incrimination when *custodial interrogation* occurs. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The fifth amendment right to counsel is distinct from the sixth amendment right to counsel; the latter is triggered by the commencement of adverse judicial proceedings. *Gouveia*, 467 U.S. at 188 n. 5, 104 S.Ct. at 2297 n. 5.

The fifth amendment privilege has both "testimonial" and "compulsion" components. *See Pennsylvania v. Muniz*, —— U.S. ——, ——, 110 S.Ct. 2638, 2644, 110 L.Ed.2d 528 (1990). It only protects an accused "from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966).

The fifth amendment does not protect a suspect from being compelled to produce a blood sample, because a blood sample is "real or physical" evidence. *Id.* at 764–65, 86 S.Ct. at 1832. Nor does introduction into evidence of a person's refusal to submit to a test violate a person's fifth amendment right against self-incrimination, because when an officer lawfully requests a test, refusal is not an act "coerced" by the officer. *South Dakota v. Neville*, 459 U.S. 553, 564, 103 S.Ct. 916, 922, 74 L.Ed.2d 748 (1983).

In *Nyflot*, the Minnesota Supreme Court held that the right to counsel recognized in *Miranda* does not apply to the limited questioning of a driver to determine if he or she will consent to a chemical test, because the inquiry of whether a suspect will take a test is not "interrogation" within the meaning of *Miranda*. *Nyflot*, 369 N.W.2d at 516; *see also State v. Whitehead*, 458 N.W.2d 145, 148 (Minn.App.1990).

■ One aspect of the issue before this court, therefore, is whether, because a criminal penalty now attaches when certain repeat offenders refuse testing, questioning them to determine if they will take a chemical test is compelled interrogation

subject to fifth amendment protections. If so, this court must determine whether the refusal is testimonial. While the Commissioner of Public Safety argues that the fifth amendment right to counsel is not applicable to the civil implied consent proceedings, we decline to decide the implied consent cases on that basis, in light of the supreme court's consideration of similar issues in *Nyflot*. *Id.* at 516.

A testing request in the context of a DWI arrest is not interrogation; the request is "highly regulated by state law," section 169.123, subd. 2(b), and "presented in virtually the same words to all suspects." *Neville*, 459 U.S. at 564 n. 15, 103 S.Ct. at 923 n. 15; *see Nyflot*, 369 N.W.2d at 516. The type of coercive police techniques used to compel a confession and against which *Miranda* rights protect are not involved in the test request. *Miranda*, 384 U.S. at 446, 86 S.Ct. at 1613; *State v. Herem*, 384 N.W.2d 880, 883 (Minn.1986). The only change in the current advisory is that drivers are now told refusal "may" subject them to criminal penalties, which does not make the manner of the request more coercive.

The question also arises as to whether making refusal a crime "compels" the drivers to incriminate themselves because the drivers with the requisite revocations may commit a crime by responding to the inquiry. In *Neville*, the Court reasoned that the state gives the person the choice of taking the test, which the state could legitimately compel under *Schmerber*, or refusing. Since the test request is legitimate, it becomes no less legitimate when the state offers the second option of refusing with the attendant penalties of license revocation and the use of evidence of refusal at trial. *Neville*, 459 U.S. at 563, 103 S.Ct. at 922.

In a case before it, the Ninth Circuit considered whether Alaska's statute making refusal to submit to testing a crime "compelled" the driver to incriminate himself. While recognizing the choice in Alaska was arguably more coercive than in *Neville*, the court concluded the Supreme Court's analysis was controlling. It found

the choice not to be any more "impermissibly coercive than any order to produce physical evidence * * * backed with the sanction of criminal contempt." *Deering v. Brown*, 839 F.2d 539, 543 (9th Cir.1988). It noted as equally important the *Neville* analysis weighted it heavily that refusal was not directly compelled by the state. Instead, the state *wants* suspects to take the test.

In fact, a criminal penalty for refusal arguably compels a refusal less than the civil penalty present in *Neville* did. Although the imposition of a criminal penalty for refusal may create an inherently more coercive situation than imposition of a civil penalty for the same behavior, the compulsion it increases is the compulsion to *submit* to the breathalyzer test, not the compulsion to *refuse*, and *refusal* is the conduct made criminal in the statute. Because increasing the penalty attendant upon refusal only reduces the likelihood of refusal, *cf. Neville*, 459 U.S. at 560, 103 S.Ct. at 920–21 (allowing use of refusal at trial discourages choice of refusal), Deering's refusal was even less "compelled" than the refusal in *Neville*. *Id.* at 543 (emphasis in original). We agree with the reasoning in *Deering*, and hold that attaching a criminal penalty does not make the test request impermissibly coercive.

#### 2. Minnesota Constitution

■ Article I, section 7 of the Minnesota Constitution provides that no person shall be compelled in any criminal case to be a witness against himself. Several drivers in the cases argued here contend that this court should interpret the state constitutional provisions more broadly than the parallel federal constitutional provisions.

■ The Commissioner argues the issue of rights under the Minnesota Constitution were raised for the first time on appeal in *McDonnell*, and therefore are not properly before this court. *State v. Sorenson*, 441 N.W.2d 455, 457 (Minn.1989). Issues not first addressed by the trial court usually will not be decided for the first time on appeal, even if they involve constitutional questions concerning criminal procedure.

In *Driver*, although the issue was raised both below and in Driver's brief, the trial court did not rule on state constitutional grounds. However, in order to comprehensively address the challenges to the statutes, we consider the issue here.

In 1973, the Minnesota Supreme Court held that admission of evidence that a defendant refused to submit to testing violated the privilege against compelled self-incrimination pursuant to the federal fifth amendment, article 1, section 7 of the Minnesota Constitution, and Minn.Stat. § 169.121. *State v. Andrews*, 297 Minn. 260, 261, 212 N.W.2d 863, 864 (1973), *cert. denied*, 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974). Subsequently, the United States Supreme Court issued its decision in *Neville*, holding that evidence of refusal is not protected by the fifth amendment. *Neville*, 459 U.S. at 554, 103 S.Ct. at 917. The Minnesota Supreme Court has followed *Neville* as to the interpretation of the federal constitutional provisions. *Nyflot*, 369 N.W.2d at 516. The ruling in *Andrews* as to the interpretation of the state constitutional provision was not explicitly overruled. *See State v. Willis*, 332 N.W.2d 180, 183 n. 1 (Minn.1983).

In 1990, our court held the driver's privilege against self-incrimination was not violated under the Minnesota Constitution, noting that *Andrews* was of questionable precedential value in light of *Nyflot. Friedman v. Comm'r of Public Safety*, 455 N.W.2d 93, 98 (Minn.App.1990), *pet. for rev. granted* (Minn. July 6, 1990). We decline to interpret section 7 more broadly than the federal constitution as to the issue presented here as well. *See Chock v. Comm'r of Public Safety*, 458 N.W.2d 692, 694 (Minn.App.1990) (choosing to follow Supreme Court interpretation of federal constitution in challenge to constitutionality of DWI roadblock); *Whitehead*, 458 N.W.2d at 148 n. 2 (declining to interpret state constitution more broadly than federal constitution in determining whether videotape of implied consent advisory was inadmissible).

## II.

In 1989, the legislature amended the DWI law to make refusal to submit to testing a gross misdemeanor if the person has certain prior license revocations. Minn.Stat. § 169.121, subds. 1a, 3(c) (Supp. 1989). At that time, it also amended the implied consent advisory. The advisory now provides, in relevant part:

At the time a test is requested, the person shall be informed:

(1) that Minnesota law requires the person to take a test to determine if the person is under the influence of alcohol or a controlled substance * * *;

(2) that if testing is refused, *the person may be subject to criminal penalties*, and the person's right to drive will be revoked for a minimum period of one year * * *;

(3) that if a test is taken and the results indicate that the person is under the influence of alcohol or a controlled substance, the person will be subject to criminal penalties and the person's right to drive may be revoked for a minimum period of 90 days * * *;

(4) that after submitting to testing, the person has the right to consult with an attorney and to have additional tests made by someone of the person's own choosing; and

(5) that if the person refuses to take a test, the refusal will be offered into evidence against the person at trial.

Minn.Stat. § 169.123, subd. 2(b) (Supp.1989) (new portion emphasized). In the implied consent cases before the court, the trial courts found that the advisory was so confusing and misleading or such a misstatement of law that the license revocations should be rescinded. The trial court in *State v. McCauley* found the statute unconstitutionally vague and dismissed the count charging a refusal.

■ A driver of a motor vehicle is deemed to have consented to the implied consent testing procedures. Minn.Stat. § 169.123, subd. 2(a) (Supp.1989); *State, Dep't of Public Safety v. Wiehle*, 287 N.W.2d 416, 418 (Minn.1979). The driver may nonetheless refuse testing. *Nyflot*,

369 N.W.2d at 517. The purpose of the advisory is not to persuade a driver to refuse testing, but to let a driver know the serious consequences of refusal. *Tyler v. Comm'r of Public Safety*, 368 N.W.2d 275, 280 (Minn.1985). We reaffirm here that the rights of a person in implied consent proceedings must be considered within the framework of reasonableness. *Wiehle*, 287 N.W.2d at 419.

The supreme court has not required officers to give advice other than that which the legislature mandates. *State v. Abe*, 289 N.W.2d 158, 160 (Minn.1980). This court has recommended that officers read the exact words of the statute to avoid confusion or improper deviation. *Hallock v. Comm'r of Public Safety*, 372 N.W.2d 82, 83 (Minn.App.1985). The drivers here do not contend that the officers incorrectly read the advisory or conducted themselves in any way to confuse the drivers but, instead, challenge the statutory language itself.

A. *Void for vagueness*

A criminal statute is void for vagueness if it fails to

define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

*Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). The state need not give any warning other than the criminal statute itself. *See State v. King*, 257 N.W.2d 693, 697–98 (Minn. 1977) (every person is presumed to know the law). The legislature has chosen to give a fuller warning through the advisory, and we conclude the advisory is reasonable.

The criminal refusal statute provides:

It is a crime for any person to refuse to submit to a chemical test of the person's blood, breath, or urine under section 169.123 if the person's license has been revoked once with the past five years, or two or more times within the past ten years [for enumerated alcohol-related driving offenses].

Minn.Stat. § 169.121, subd. 1a (Supp.1989). The implied consent advisory informs the driver

that if testing is refused, the person may be subject to criminal penalties, and the person's right to drive will be revoked for a minimum period of one year;

Minn.Stat. § 169.123, subd. 2(b)(2) (Supp. 1989).

The use of the word "may" in describing the potential of criminal refusal liability does not render the advisory vague or misleading. *See State v. Andersen*, 370 N.W.2d 653, 663 (Minn.App.1985) (general terms used in a statute are not unconstitutional due to vagueness when greater specificity is impractical). This court has rejected a due process challenge to the implied consent advisory because it warned the driver that his license "will" be revoked for a refusal but "may" be revoked for taking and failing a chemical test. *State v. Frank*, 365 N.W.2d 313, 314 (Minn.App. 1985). The *Frank* court noted a number of contingencies, including the legality of the arrest and the outcome of administrative and judicial review proceedings, affected whether a license would actually be revoked. *Id.* *Due process does not require a driver be given a warning of all possible consequences of his decision whether to refuse testing. Abe*, 289 N.W.2d at 160–61 (failure to warn driver of civil revocation for test failure did not offend due process).

The implied consent advisory informs the driver that the law requires him to take the test. The driver is told that if he refuses testing his license will be revoked for a minimum of one year. Minn.Stat. § 169.123, subd. 2(b)(2). The severity of such a revocation was recognized by the supreme court when the revocation minimum was half its current length. *Prideaux v. State, Dep't of Public Safety*, 310 Minn. 405, 409, 247 N.W.2d 385, 388 (1976) (noting that the mandatory revocation for refusal, then only six months, might be a greater burden than the criminal conviction).

The civil consequences of license revocation make it clear that the advisory is intended to induce the driver to take the test.

With a license revocation of a minimum of one year for refusal, refusal is plainly "not a 'safe harbor,' free of adverse consequences." *Neville*, 459 U.S. at 566, 103 S.Ct. at 924. Comparing the one-year refusal minimum with the 90–day minimum revocation for failing the test, the civil consequences weigh heavily in favor of taking the test.

The information given the driver in the implied consent advisory is "accurate and relevant." *Abe*, 289 N.W.2d at 161. The refusal statute and the advisory are not unconstitutionally vague and do not "entrap" the driver into refusing testing.

### B. *Confusion as a grounds for rescission of revocation*

■ In the implied consent cases, the drivers argue that, as to those with the requisite prior revocations, the advice that "if testing is refused, the person may be subject to criminal penalties," does not sufficiently advise them that it is a crime for persons with such prior revocations to refuse testing. Therefore, they contend the advisory is misleading and a misstatement of law.

As noted above in *Abe*, the supreme court addressed a challenge to the statutorily mandated advisory language. Under the then applicable law, the driver was advised only that he could be subject to revocation for refusal. While he could also be subject to revocation for test failure under a separate statutory provision, there was no requirement that he be so advised. Abe contended that due process required he be given all relevant information about the consequences of consenting to the test. The court noted the implied consent law established his continuing consent, and he could prevent the test only by withdrawing consent:

> [H]e received the information which the legislature required to be given concerning the withdrawal of consent. The information was accurate and relevant. It also promoted peaceable submission to the blood test. Abe did not withdraw his consent. There is nothing in the statutory procedures which were followed in

this case that involved any violation of due process.

*Abe*, 289 N.W.2d at 161. *See also State v. DeGier*, 387 N.W.2d 227, 229–30 (Minn. App.1986). Likewise, the statutory language here sufficiently informs these drivers of the law, and no due process violation occurred.

The drivers also argue that it is confusing and inaccurate to be advised that they "may" be subject to criminal penalties for refusing, while being informed their license to drive "will" be revoked for refusal. This court addressed a similar argument in *Frank*. The court recognized that it may be preferable to use parallel language. However, because the happening of the actual event is contingent on a number of events, this court held the use of the word "may" is accurate and does not violate due process rights. *Frank*, 365 N.W.2d at 314.

The advisory is not the charging document, but is the statement set out by the legislature to generally alert the driver of possible legal consequences, and should be judged by a reasonableness standard. *See Wiehle*, 287 N.W.2d at 419. To set aside the advisory because of the use of the word "may" is to place a hyper-technical emphasis on it, rather than the liberal construction contemplated to effectuate its purpose. *See Juncewski*, 308 N.W.2d at 319.

Some would impose upon the arresting officer the burden of ascertaining whether the individual is subject to the criminal refusal law. If so, it is argued, the officer should advise the driver of the refusal law and read the *Miranda* warning, and if not, the advisory should be given without mention of the refusal law. We decline to place this additional task upon officers who have many other duties to fulfill while at the scene of a possible DWI arrest. The statute does not require the officers to make this determination, and we decline to enforce a statutory scheme which the legislature did not require. *Abe*, 289 N.W.2d at 160.

Finally, we address the advisory as applied to one to whom the criminal refusal statute does not apply. In *Moser v. Commissioner of Public Safety*, the driver,

who had no prior revocations, took the test. She testified she did not understand the advisory and that her decision to take the test would have been different if she had not believed she could be subject to criminal penalties for refusing. The *Moser* court held that because Moser could not be subject to criminal penalties, the advisory was a misstatement of law, and prevented her from voluntarily consenting to testing. It found she was confused by the language read to her and that the language of the advisory was so confusing and incorrect as to render the advisory ineffective.

We first note that Moser does not raise constitutional claims. Moser's consent is deemed continuing under subdivision 2(a) of section 169.123, and she does not have any "right" to withdraw her consent. *Nyflot*, 369 N.W.2d at 517. The right to refuse is "simply a matter of grace" bestowed by the legislature, unlike the constitutional right to silence underlying *Miranda* warnings. *Neville*, 459 U.S. at 565, 103 S.Ct. at 923. The advisory is intended to give drivers general notice of the law, and cannot be and need not be precise as to each driver's individual situation. The legislature determined that the advisory, which is already lengthy, need only generally advise drivers that they "may" be subject to criminal penalties upon refusal. We must liberally interpret the language of the statute in favor of the public interest. *Juncewski*, 308 N.W.2d at 319. "When the meaning of a statute is doubtful, courts should give great weight to a construction placed upon it by the department charged with its administration." *Krumm v. R.A. Nadeau Co.*, 276 N.W.2d 641, 644 (Minn.1979). We agree with the Commissioner that the language of the advisory as applied to drivers not subject to the criminal refusal law is reasonable.

We next address the *Moser* court's finding that the language of the advisory prevented her from voluntarily consenting to the test. The supreme court has said that

> where the driver's physical or mental condition as a result of alcohol consumption or the effects of injury or treatment for injury precludes him from knowingly, voluntarily, or intelligently exercising his statutory choice to refuse submission to such test, his statutorily implied consent remains continuous.

*State, Dep't of Public Safety v. Hauge*, 286 N.W.2d 727, 728 (Minn.1979). Likewise, where we have held the language of the advisory is sufficient, no question arises as to "voluntary" consent. The trial court also found Moser was confused by the language of the advisory, and that the language was both confusing and incorrect.

In light of our decision that the language is sufficient, we also hold that the trial court is incorrect as a matter of law. The officer gave Moser the advice required, as well as discussing the matter with her, and nothing more is required. *Abe*, 289 N.W.2d at 161. Moser does not contend that any conduct of the officer, except for the reading of the mandated statutory language, caused her confusion, and we find none.

With respect to the first-time offender, the implied consent advisory's warning on the consequences of refusal must be less strictly scrutinized. *See, e.g., Horn v. Burns & Roe*, 536 F.2d 251, 254–55 (8th Cir.1976) (due process requires less literal exactitude in a statute providing no criminal sanctions). Procedural due process does apply to driver's license revocations. *See Dixon v. Love*, 431 U.S. 105, 112, 97 S.Ct. 1723, 1727, 52 L.Ed.2d 172 (1977). Nonetheless, the driver is fully advised as to the only means by which he may avoid revocation: take the test and pass it. Some additional advice as to relative consequences is given, but the same warning must serve for all drivers, and

> there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.

*United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL–CIO*, 413

U.S. 548, 578–79, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973).

The warning specifically informs drivers they are required to take the test and their licenses will be revoked if they refuse. If the advisory gives first-time offenders more incentive to submit to testing than they otherwise would have, that result is in their own best interest, as well as being in the public interest. As the Supreme Court has stated with regard to criminal statutes:

> The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.

*Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972).

### III.

In *Weeding v. Commissioner of Public Safety,* the trial court rejected the driver's argument that his right to equal protection under the law had been violated. The driver did not file a notice of review, but argues the issue in his brief. A respondent must file a notice of review to raise an issue adversely decided by the trial court. Minn.R.Civ.App.P. 106. Failure to file a notice of review can bar a respondent from presenting issues. *Arndt v. Am. Family Ins. Co.,* 394 N.W.2d 791, 793 (Minn.1986). Under the unusual circumstances of these combined cases, we exercise our discretion to nonetheless address the issue. *Id.* at 794.

Weeding contends that because only individuals with the requisite prior license revocations are denied their right to remain silent when asked whether to submit to a test, this classification is a violation of their right to equal protection. The legislature has broad discretion to define criminal acts, and may select those acts which it believes pose the most significant societal problems. *State v. Witt,* 310 Minn. 211, 215, 217, 245 N.W.2d 612, 615, 617 (1976).

The sole limitation which the equal protection clause imposes upon the legislature in the exercise of this power is that criminal statutes must not prescribe different punishments "for the same acts committed under the same circumstances by persons in like situations."

*Id.* at 215, 245 N.W.2d at 616 (citation omitted).

The legislature has previously taken steps to encourage drivers to take the test. Drivers who refuse are subject to a one-year license revocation, while those who take and fail the test receive a 90–day revocation. Minn.Stat. § 169.123, subd. 4. In addition, evidence of refusal to take a test is admissible into evidence in a prosecution under Minn.Stat. § 169.121, subd. 1, § 169.121, subd. 2.

The 1989 legislature wanted to address the specific problem of repeat offenders who refuse to provide a test. These individuals, who may well be aware from past experience the effect a test result has on a jury in a DWI trial, pose a special problem. Hearing on S.F. No. 851 Before the Senate Judiciary Committee (Mar. 29, 1989); Hearing on S.F. No. 851 Before the House Judiciary Committee (Apr. 24, 1989). Still choosing not to force the drivers to take a test against their will, *see Nyflot,* 369 N.W.2d at 517, the legislature instead criminalized refusal for those with the requisite number of prior license revocations. We note the prior license revocations which can cause a person to be subject to the refusal law, one in the past five years or two or more in the past ten years, track the gross misdemeanor DWI law, Minn.Stat. § 169.121, subd. 3(b). The classification reasonably addresses the serious problem of repeat offenders who refuse to take the test and prevent the use of such evidence in their subsequent DWI trials. The law does not treat similarly situated persons differently, and does not violate equal protection rights of repeat offenders.

### CONCLUSION

We conclude that the constitutional challenges to the implied consent advisory and the criminal refusal statute, in each of the

five cases before the court, must fail. The trial court's order in *State v. McCauley* finding the implied consent advisory void for vagueness is erroneous, and the criminal charge of gross misdismeanor refusal should not have been dismissed. Similarly, the order in *State v. Driver*, which did not specify a specific constitutional violation in dismissing the criminal charge, must be reversed. The trial court order in *McDonnell v. Commissioner of Public Safety*, finding a fifth amendment violation, and the court order in *Weeding v. Commissioner of Public Safety*, finding the advisory misleading and a misstatement of law, are each erroneous. Finally, the trial court erred in *Moser v. Commissioner of Public Safety* in concluding the advisory is misleading as to the driver with no prior revocations.

The statute sets out what the police officer must read to the suspected drunk driver. *See* Minn.Stat. § 169.123, subd. 2(b). In the most recent United States Supreme Court case, Justice Brennan spoke to the issue of implied consent and what was said regarding legal consequences having lawfully stopped a vehicle:

> [The officer] read Muniz a prepared script explaining how the test worked, the nature of Pennsylvania's Implied Consent Law, and the legal consequences that would ensue should he refuse.
> * * *
> * * * [the officer] carefully limited her role to providing Muniz with relevant information about the breathalyzer test and the implied consent law. She questioned Muniz only as to whether he understood her instructions and wished to submit to the test. These limited and focused inquiries were necessarily "attendant to" the legitimate police procedure, see *Neville, supra*, at 564, n. 15 [103 S.Ct. at 923, n. 15], and were not likely to be perceived as calling for any incriminating response.

*Muniz,* —— U.S. at ——, 110 S.Ct. at 2652 (footnote omitted).

Law enforcement officials in the performance of their duties begin their inquiry of the driver with the firm knowledge that the statute already imposes upon the driver consent to testing. Minn.Stat. § 169.123, subd. 2(a). It is within the power of the legislature to lay down reasonable conditions for the privilege of driving a motor vehicle on our highways, and the implied consent advisory comes within the umbrella of reasonableness. By using the public streets and highways, drivers are not only deemed to have consented to testing but are charged with the knowledge that to drive under the influence is against the law and they can be prosecuted and/or their driver's licenses revoked if they drive under the influence.

The philosophy of our own court toward the whole matter of public safety is pointedly brought together in *Szczech:*

> The right of the public to be free from the unwarranted dangers posed by drinking drivers far outweighs any interest any individual may have in the continued unrestricted operation of motor vehicles. This public interest mandates a nonrestrictive application of the statute to give effect to the clear legislative intent to have the statute made as effective a remedy as possible for the removal of drinking drivers from our streets and highways.

*Szczech,* 343 N.W.2d at 307. *See Juncewski,* 308 N.W.2d at 319; *State v. Mulvihill,* 303 Minn. 361, 363, 227 N.W.2d 813, 815 (1975) (caselaw restricting application of implied consent law should be narrowly construed).

## DECISION

The trial court orders dismissing criminal charges for refusing testing or rescinding driver's license revocations in each of these separate cases are reversed. We remand for trial or other proceedings consistent with this opinion.

Reversed and remanded for further proceedings.

LANSING, FORSBERG, CRIPPEN, KALITOWSKI, SCHUMACHER, SHORT and GARDEBRING, JJ., concur in the result reached by the majority.

LANSING, Judge (concurring specially).

I concur in the result reached by the majority. I write separately on the use of the advisory for first-time offenders because I analyze that issue differently and may not want to be bound to the majority's analysis in future cases that extend beyond the implied consent proceeding.

I agree that the advisory is not fatally inaccurate if the driver has a previous alcohol-related violation within five years or two such violations within ten years. *See* Minn.Stat. § 169.121, subd. la (Supp.1989). The warning may be incomplete in its advice to these drivers but it is not incorrect. Incompleteness has previously been held not to be a fatal defect. *See State v. Frank*, 365 N.W.2d 313, 314 (Minn.App. 1985); *see also Duckworth v. Eagan*, —— U.S. ——, 109 S.Ct. 2875, 2879, 106 L.Ed.2d 166 (1989).

When this same advisory is given to a first-time offender, however, the advisory is wrong. No first-time offender *will* be subject to criminal penalties for refusal to take the test. I agree with the majority's assertion that due process requirements are not as exacting when, as here, the first-time offender is not faced with criminal penalties. I also observe that Moser's conceding to take the test and then failing has a net effect of receiving a 90–day suspension rather than one year. Although there may be other effects on Moser's license privileges or insurance rates, this deprivation was not affirmatively presented to the trial court or raised in the appeal.

The real problem, as I see it, emerges when the state attempts to use the test results as evidence against the driver in the criminal proceeding. Evidence obtained by threatening a criminal prosecution, when no criminal law has been violated, violates constitutional rights, and the evidence should not be admitted in a criminal case. Obtaining evidence in this way unfairly "tricks" a driver and implicates due process protections. *See South Dakota v. Neville*, 459 U.S. 553, 566, 103 S.Ct. 916, 924, 74 L.Ed.2d 748 (1983). This misinformation is all the more damaging because the person is in custody and prevented from consulting an attorney. By adding only a few words the advisory could be made accurate and could avoid improperly coercing first-time offenders.

CRIPPEN, Judge (concurring specially).

I concur in the conclusion that we must correct reversible error in all five cases being reviewed. This holding is compelled by the precedents stated in the majority opinion. It is our only prerogative as an intermediate appellate court to follow these authorities.

The various opinions now expressed by this court prompt additional comment on the law of the case.

In my opinion, the result here is shaped inescapably by holdings of the United States Supreme Court in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) and *Pennsylvania v. Muniz*, —— U.S. ——, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), and application of these decisions by the Minnesota Supreme Court in *Nyflot v. Commissioner of Public Safety*, 369 N.W.2d 512 (Minn.1985), *appeal dismissed*, 474 U.S. 1027, 106 S.Ct. 586, 88 L.Ed.2d 567 (1985). *Neville* and *Nyflot* are especially critical for our analysis. The holdings in these cases are wrongfully disregarded in proposals to correct the legislative actions being reviewed. To demonstrate this point, these five observations are added:

1. Given the controlling law, there is no merit in the plea of respondent Moser. Indisputably, the Minnesota Legislature has authority to give or to take away freedom of a driver to refuse and it has also created the impairments of that freedom which are now criticized. It has to be remembered, however, that criticism of steps to impair the right is also aimed at a legislative enactment. The content of the implied consent advisory is not chosen by an official or an agency, but by the legislature itself. *See* Minn.Stat. § 169.123, subd. 2(b) (Supp. 1989).

As vigorously asserted by respondent Moser, a driver's interest in refusal may be frustrated by the form of the advisory. Indeed, the advisory seems senseless; it warns many drivers of a danger they don't face—the risk of conviction for the act of refusal. Nevertheless, this effect of the advisory represents the will of the legislature. They could, if they wished, further restrict the right of refusal. Under *Schmerber,* no basis exists for a judicial effort to enlarge the right of refusal.

*Moser* is a civil proceeding. *Schmerber* goes further, however, declaring the law governing collection of evidence for criminal cases.

2. The *Schmerber* court refused to recognize that fifth amendment rights are implicated when a driver consents to chemical testing. *Schmerber,* 384 U.S. at 761–65, 86 S.Ct. at 1830–33. The *Neville* court took the next step, refusing to recognize a fifth amendment right to refuse testing. *Neville,* 459 U.S. at 561–65, 103 S.Ct. at 921–23. According to the *Neville* court, because the choice to refuse is not an act coerced by a police officer, it is not protected by the privilege against self-incrimination. *Id.* We have no freedom to avoid the *Neville* rationale.

It is contended that establishing a crime of refusal is significantly more serious than the *Neville* court's allowance of the proof of refusal as evidence of a drinking offense. These two effects of refusal are different, but the difference is not germane to the rationale of *Neville.* Regardless of the consequence of refusal, *Neville* establishes that the act of refusal is not coerced when the driver is given an option through a lawful request for consent to testing.

3. *Neville* also goes further, lending support for courts that have viewed the act of refusal as nontestimonial, and thus beyond the scope of the fifth amendment. *Id.* 459 U.S. at 560–61, 103 S.Ct. at 920–21. We have found no basis to declare otherwise.

It is contended that the words "I refuse" are incriminating testimony in a prosecution for a refusal to submit to a test. The significance of refusal, however, lies in the act and not in the words. *Id.* This is the rule on admitting refusal evidence in a DWI prosecution, and no reason has been identified for distinguishing the use of refusal evidence in a prosecution for refusing a test.

4. The respondents' fifth amendment rationale involves still a third obstacle. Following the holding in *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980), the *Neville* court observed that the statement of choices in an implied consent advisory is not a form of interrogation. *Id.* 459 U.S. at 564 n. 15, 103 S.Ct. at 923 n. 15. This approach was specifically adopted by the Minnesota Supreme Court in *Nyflot. Nyflot,* 369 N.W.2d at 516.

5. The several implications of *Schmerber* and *Neville* remain undisturbed as a matter of federal law. Most recently, in an opinion authored by Justice Brennan, the fifth amendment rationale of these cases was enunciated again. *Muniz,* —— U.S. at ——, 110 S.Ct. at 2643–52. The court found the entire implied consent advisory outside the realm of fifth amendment protections, except for an extraneous effort of the advising police officer to verbally test the driver's sobriety. *Id.* at ——, 110 S.Ct. at 2645–49.

6. The most telling challenge to the current scheme of implied consent law is stated in terms of fourteenth amendment due process. The judiciary should be urgently concerned about the clarity of an advisory where the resulting conduct of the driver may constitute a crime and where the advisory and the driver's conduct occur while the driver is in a police officer's custody and has no access to counsel. Important public policy considerations support modification of the advisory to specifically indicate that the refusal constitutes a criminal act. Nevertheless, the legislators are the policymakers, and existing fourteenth amendment law gives this court no freedom to interfere.

Precedent on this issue is almost completely limited to the *Neville* decision. The *Neville* court concluded it was not "fundamentally unfair" to use the act of refusal

as evidence of criminal fault. *Id.* at 565, 103 S.Ct. at 923. The *Neville* driver was confronted with a request for a test to determine blood alcohol concentration and was told that refusal could lead to the loss of driving privileges. The warning on loss of license "made it clear," thought the Supreme Court, "that refusing the test was not a 'safe harbor' free of adverse consequences." *Id.* at 566, 103 S.Ct. at 924. The court reached this conclusion even though the driver was not specifically warned that refusal evidence might be used against him in a DWI prosecution. In the cases before us, the drivers were also warned about license revocation. Making the harbor of refusal appear even less safe, the current advisory says that "if testing is refused, the person may be subject to criminal penalties." Minn.Stat. § 169.123, subd. 2(b)(2) (Supp.1989).

One respondent contends that the realistic effect of the present advisory is to compel refusal because the criminal consequences of a failed test are made clear and because the existence of a separate crime of refusal is not sufficiently announced. Thus, respondent implies that the *Neville* rationale does not govern the facts surrounding use of this advisory. This argument disregards the warnings of the advisory about refusal. Moreover, it only speculates as to the meaning of the advisory for the average driver, and it poses a meaning which is defied by the records before us. The advisory contains warnings about refusal, both as to possible revocation and possible criminal penalties. Furthermore, it is difficult to imagine any driver failing to perceive that the advisory is a process employed as part of a police effort to obtain a chemical test. Importantly, none of the drivers in the case before us has offered evidence that they believed the advisory compelled a refusal.

It is significant to look with care at the position of respondent Moser, and her extensive arguments that she was unduly misled by the present advisory. Moser pleaded specifically that the advisory compelled her to give a test and that it unduly frightened her regarding the consequences of refusal. This evidence leaves little room for the argument that the advisory invites refusal as a matter of fact.

The several opinions here prompt two additional observations:

1. We know, of course, that the issues here involve tension between the vital policy interests of public safety and personal liberty. While it is the prerogative of an intermediate appellate court to offer its opinions on these policy considerations, the exercise seems meaningless in the circumstances here; the supreme courts of this state and of the nation have deliberated on these matters and rendered controlling decisions. Thus, I make no statement about liberty rationales that have been defeated by controlling high court decisions. Similarly, I do not join in the opinion that our decision here rests on this court's preference for public safety interests.

2. I also elect against stating any opinion for or against identifying sufficient liberty interests under the Minnesota Constitution that might contradict federal law on these important issues. Ultimate authority clearly rests with the supreme court of the state to declare state constitutional law in conflict with federal law. *State v. Fuller*, 374 N.W.2d 722, 726 (Minn.1985). Moreover, to a large extent the Minnesota Supreme Court has already spoken on the question; the majority in *Nyflot* gives no heed to the dissent's arguments on the state constitutional principles. In addition, an array of pertinent constitutional questions is already before the supreme court in *Friedman v. Commissioner of Public Safety*, 455 N.W.2d 93 (Minn.App.1990), *pet. for rev. granted* (Minn. July 6, 1990).

WOZNIAK, Chief Judge (concurring in part/dissenting in part).

I concur with the majority result as to *McDonnell* and *Weeding.* I concur with Judge Huspeni's dissent as to *Driver* and *McCauley.* I respectfully dissent as to *Moser.*

Cindy Moser was read an advisory which, as to her, was an incorrect statement of the law. The majority and concurring opinions suggest the advisory's inaccurate state-

ment did not prejudice Moser in the end result because she took the breath test. This analysis ignores the unconstitutional and fundamentally unfair coercion Moser suffered at the time the advisory was read. Therefore, I respectfully dissent from the majority's decision to reinstate the revocation of her driver's license.

## I.

A state may force suspected drunk drivers to submit to testing. *South Dakota v. Neville,* 459 U.S. 553, 558, 103 S.Ct. 916, 920, 74 L.Ed.2d 748 (1983). However, the Minnesota legislature has given drivers the option to refuse consent. *Nyflot v. Comm'r of Public Safety,* 369 N.W.2d 512, 517 (Minn.1985), *appeal dismissed,* 474 U.S. 1027, 106 S.Ct. 586, 88 L.Ed.2d 567 (1985); *Thornton v. Comm'r of Public Safety,* 384 N.W.2d 606, 608 (Minn.App. 1986). Although a driver does not have a "right" to refuse testing, a driver can elect to refuse *if the driver accepts the consequences of the decision. State v. DeGier,* 387 N.W.2d 227, 229 (Minn.App.1986).

Whether to submit to testing is an important decision with civil and criminal consequences. *Connor v. Comm'r of Public Safety,* 386 N.W.2d 242, 245 (Minn.App. 1986). It is "the kind of decision for which the advice of counsel arguably could be useful." *Nyflot,* 369 N.W.2d at 517.

Instead of allowing DWI suspects access to counsel, the Minnesota legislature has appointed itself their advisor. A prerequisite to license revocation under the implied consent law is compliance with its mandate that an advisory be read to the driver. *Tyler v. Comm'r of Public Safety,* 368 N.W.2d 275, 280 (Minn.1985). The advisory is designed to inform a driver of his or her rights and obligations under the implied consent law. *Id.; Golinvaux v. Comm'r of Public Safety,* 403 N.W.2d 916, 919 (Minn.App.1987). The advisory tells the driver that he or she has a choice between refusing or submitting to testing and describes the consequences of either option. Minn.Stat. § 169.123, subd. 2(b) (Supp. 1989). The legislature has included the issue whether the driver was properly in-

formed as among those for judicial review of the revocation decision. Minn.Stat. § 169.123, subd. 6(2) (Supp.1989). *See Dehn v. Comm'r of Public Safety,* 394 N.W.2d 272, 273–74 (Minn.App.1986). Faced with the important decision whether to submit to testing, the driver must be accurately informed.

Minnesota courts have previously examined claims that the implied consent advisory misleads drivers who are requested to test under the implied consent law. *See, e.g., State v. Abe,* 289 N.W.2d 158 (Minn. 1980); *State v. Frank,* 365 N.W.2d 313 (Minn.App.1985). We have also examined claims that information given in addition to or instead of that contained in the advisory was misleading. *See, e.g., Connor,* 386 N.W.2d at 242.

In addressing these types of claims, we have examined whether the information given was an accurate statement of the law. *See Gunderson v. Comm'r of Public Safety,* 351 N.W.2d 6, 7 (Minn.1984); *State, Department of Public Safety v. Early,* 310 Minn. 428, 247 N.W.2d 402 (1976); *State, Department of Public Safety v. Lauzon,* 302 Minn. 276, 224 N.W.2d 156 (Minn.1974); *State, Department of Public Safety v. Nystrom,* 299 Minn. 224, 217 N.W.2d 201 (Minn.1974); *Golinvaux,* 403 N.W.2d at 916; *DeGier,* 387 N.W.2d at 229; *Hallock v. Comm'r of Public Safety,* 372 N.W.2d 82 (Minn.App.1985); *Holtz v. Comm'r of Public Safety,* 340 N.W.2d 363 (Minn.App. 1983). Underlying these decisions is the assumption that, at a minimum, the information given a driver must be accurate.

*Connor,* on which the trial court relied in rescinding Moser's license revocation, is a fitting example of our prior analysis. The driver claimed the information given her was so misleading as to require her license revocation be rescinded despite the fact that she took, rather than refused, the test. *Connor,* 386 N.W.2d at 244. Her argument was properly before the court under section 169.123, subd. 6(2). However, we reinstated the revocation after determining whether the information given her in addition to the advisory was a misstatement of the law. *Id.* at 245. We found the infor-

mation was not misleading or confusing. *Id.* at 245–46.

Thus, the implied consent statute, and our case law, have made proper advice to a driver necessary to proper application of the implied consent law.

Minn.Stat. § 169.121, subd. 1(a) (Supp. 1989), provides it is a crime to refuse testing if the driver's license has been revoked once within the past five years, or two or more times within the past ten years. Moser's license *had never been revoked before the incident giving rise to this appeal. Moser was not, and could not be subject to criminal penalties for refusing to test. However, the state certainly misled Moser. In the guise of advising Moser about the consequences of refusal, the police incorrectly told her she could be subject to criminal penalties.*

### II.

In Minnesota, a driver is deemed to have consented to testing for intoxication under Minn.Stat. § 169.123, subd. 2(a) (Supp. 1989). *State, Department of Public Safety v. Wiehle,* 287 N.W.2d 416, 418 (Minn. 1979).

Implied consent does not obviate analysis of whether Moser was correctly advised when she decided to be tested. Only when a driver lacks the capacity to revoke consent is implied consent deemed continuous and informed choice irrelevant. *Villeneuve v. Comm'r of Public Safety,* 417 N.W.2d 304, 306–08 (Minn.App.1988); *Thornton,* 384 N.W.2d at 607–08; *Douglas v. Comm'r of Public Safety,* 385 N.W.2d 850, 852–54 (Minn.App.1986), *pet. for rev. denied* (Minn. June 19, 1986). *Compare Rude v. Comm'r of Public Safety,* 347 N.W.2d 77, 80 (Minn.App.1984). As long as capacity to revoke consent exists, our laws require that the driver be informed of the consequences and be given the opportunity for doing so.

*The state cannot give a driver the choice of taking or refusing the test, appoint itself advisor as to the consequences of refusing, and then supply misinformation about those consequences.*

### III.

Fundamental fairness is the quintessence of the due process clause. While Moser did not label her argument below a due process challenge to the implied consent law, due process of law is the essence of her claim and the trial court's decision. *See Raley v. Ohio,* 360 U.S. 423, 436, 79 S.Ct. 1257, 1265, 3 L.Ed.2d 1344 (1959).

The due process requirement of the fourteenth amendment *is* a right; it does not operate solely to protect other recognized rights. An individual has the right to due process of law when loss of life, liberty, or property is threatened by the state.

A State may not issue commands to its citizens, under criminal sanctions, in language so vague and undefined as to afford no fair warning of what conduct might transgress them. * * * Inexplicably contradictory commands in statutes ordaining criminal penalties have, in the same fashion, judicially been denied the force of criminal sanctions. * * * Here there were more than commands simply vague or even contradictory. There was active misleading.

*Raley,* 360 U.S. at 438, 79 S.Ct. at 1266 (citations omitted).

More offensive than statutes found void for being so vague as to afford no fair warning of what conduct violates them, the implied consent advisory actively misleads the driver with no prior license revocation.

*Moser was misled into making the preferred choice of testing by the state's provision of inaccurate information as to the consequences of not testing. This process of actively misleading first time offenders into thinking they are subject to criminal penalties if they refuse testing is patently unfair.* Moser's license revocation should therefore be overturned.

The majority appears to have confused Moser's claim with an entrapment defense raised under the due process clause of the fifth amendment. *Compare Hampton v. United States,* 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) (government activity must violate a protected right of the defendant to establish entrapment

defense), *with Grayned v. Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). Moser only asks us whether, after deciding to inform drivers of the consequences of refusing to test, the state is permitted to provide legally inaccurate information.

The words "trap" and "entrapment" are used under the void-for-vagueness doctrine to describe the evil of convicting a person for conduct which was not clearly unlawful or which the state actively represented as lawful. *Raley,* 360 U.S. at 438, 79 S.Ct. at 1266. Thus, when refusing to sustain a conviction for exercising a privilege the state had clearly said was available, the Supreme Court stated to do otherwise "would be to sanction the most indefensible sort of entrapment by the State." *Id.*

Although Moser's revocation was shorter than the revocation for refusal, the judiciary must address the wrongs inflicted upon her by the state. The majority would seemingly affirm any advisory regardless of its coercive and inaccurate content. I cannot agree. Admittedly, the state has a valid interest in promoting the use of alcohol testing. However, a socially imperative result cannot shield a constitutionally defective process. First time offenders actively misled by the state while making this important decision are prejudicially coerced and must have standing to seek redress.

This decision does not promote lax enforcement of our drunk driving laws. It affirms the ideal of fundamental fairness embodied in our state and federal constitutions. In recent years, society has keenly focused its attention on the seriousness of drunk driving offenses. Laws passed to make convictions and license revocations easier to obtain should not subvert fairness for the sake of expediency. We must not, in service to this or any popular cause, allow government to trample the rights of individual citizens. The end does not justify the means.

NORTON, J., joins in the dissent of WOZNIAK, C.J.

HUSPENI, Judge (concurring in part/dissenting in part).

The advisory which is based on Minn. Stat. § 169.123, subd. 2(b) (Supp.1989) and which was read to McDonnell, Moser, Weeding, McCauley and Driver, is confusing and inaccurate to some degree for all drivers. However, I conclude it resulted in prejudice to only two: McCauley and Driver. It is upon this basis that I join with the majority in reversing the decisions in *Moser, McDonnell,* and *Weeding* and reinstating the license revocation of those drivers.

Moser had no prior revocations. Therefore, to the extent that the advisory indicated that she "may be subject to criminal sanctions" if she refused the test, it was inaccurate as to her. I agree, however, with the analysis of Judge Lansing to the extent that analysis is unable to discern any prejudice which befell Moser as a result of taking the test. Her license was revoked for 90 days because she took the test; it would have been revoked for one year if she had refused. Indeed, prejudice would very likely be present in a prosecution for DWI which arose out of a situation where the state obtained its evidence by threatening a criminal prosecution which could not occur under the statute, but, as Judge Lansing observes, that prosecution is not before us.

Despite my concern with the advisory, I am also unable to discern any prejudice which has befallen McDonnell and Weeding in the context of their license revocation proceedings; the only matters involving them that are before us. Notwithstanding the flawed and confusing nature of the advisory, McDonnell and Weeding *were* informed that refusal to test would result in a one-year suspension of their driving privileges. That is exactly the result appellant sought in the trial court and seeks here.[1]

I respectfully dissent from the majority's reversal in *McCauley* and *Driver* and would affirm the trial courts' dismissal of the gross misdemeanor refusal charges under Minn.Stat. § 169.121, subd. 1a (Supp.

1. I would, of course, subject criminal prosecutions brought against McDonnell and Weeding for refusal to test to the same analysis given the cases of Driver and McCauley in this dissent.

1989), on the grounds that the advisory based upon Minn.Stat. § 169.123 confused and prejudiced these two drivers.

Before addressing the confusing and prejudicial nature of the advisory given McCauley and Driver, however, I would express my agreement with the majority in several respects. First, certainly a concerned citizenry has the right and the duty to enact all reasonable measures to reduce the carnage which results from the presence on our roads of drivers who are under the influence of alcohol or drugs. I believe that the legislature reasonably may enact a statute making it a gross misdemeanor to refuse to submit to testing under the implied consent law. *See South Dakota v. Neville,* 459 U.S. 553, 565, 103 S.Ct. 916, 923, 74 L.Ed.2d 748 (1983) ("[The suspect's] right to refuse the blood alcohol test * * * is simply a matter of grace bestowed by the South Dakota Legislature"); *Nyflot v. Comm'r of Pub. Safety,* 369 N.W.2d 512, 517 (Minn.1985) ("The legislature * * * could repeal the implied consent law and direct police officers to administer chemical tests against the suspect's will").

Second, I conclude, albeit somewhat reluctantly, no fifth amendment right to remain silent was violated as to McCauley and Driver. Even though the Minnesota Supreme Court in *State v. Willis,* 332 N.W.2d 180 (Minn.1983) declined to apply *Neville,* I believe it declined because *Willis* could be decided without resort to the rationale of *Neville.* Faced squarely with the question, I believe the Minnesota Supreme Court would declare the relevant aspects of *State v. Andrews,* 297 Minn. 260, 212 N.W.2d 863 (1973), *cert. denied,* 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974), no longer viable in view of *Neville.* By reaching the conclusion that *Andrews* is no longer good law, I am accepting, of course, the majority's determination that the Minnesota Supreme Court would decline to interpret the Minnesota Constitution as affording greater protection to an accused under the fifth amendment than does the United States Constitution.

Under *Neville,* a refusal must be both compelled and testimonial before it violates an individual's fifth amendment rights. *Id.,* 459 U.S. at 559, 103 S.Ct. at 920. While I believe that the advisory as here constituted does logically compel a refusal, I accept the analysis that the refusal is not testimonial.[2] *See Friedman v. Comm'r of Pub. Safety,* 455 N.W.2d 93, 97 (Minn.App. 1990) ("[R]efusal to take a test after being lawfully requested to do so is not an act coerced by the officer and *is not protected by the federal privilege against self-incrimination*") (emphasis added), *pet. for rev. granted* (Minn. July 6, 1990).[3]

Further, I accept the majority's position regarding the sixth amendment. I conclude *Nyflot* is still good law because the sixth amendment right to counsel does not attach until judicial proceedings are commenced.[4] *See Nyflot,* 369 N.W.2d at 515–16 (citing *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) and *United States v. Gouveia,* 467 U.S. 180, 104

---

2. Arguably, of course, even the *Neville* court might re-examine its holding that "refusal is not testimonial in nature" if it were presented with the facts of the criminal cases before this court. In *Neville,* the evidence of refusal was to be admitted in a case where the charge was DWI. Here, evidence of refusal will be admitted as "nontestimonial in nature" in cases involving a charge of "refusal to take a test." Logic and credulity strain somewhat under application of the *Neville* "nontestimonial" fifth amendment rationale to cases where the suspect's refusal is not entered as evidence of a separate crime but is, itself, the specific act for which the driver is being punished.

3. The clarity of the amended refusal and advisory statute was not before the *Friedman* court as the amended statute was not then effective.

4. One might appropriately question whether the rationale of *Nyflot* should extend beyond charges of DWI to charges of "refusal to test." The *Nyflot* court observed that

> the right to counsel recognized in *Miranda* does not apply to the limited questioning of a driver to determine if he will consent to a chemical test. The *Miranda* right to counsel applies only to "interrogation," which the Court has defined as express questioning or other words or actions by police *reasonably likely to evoke an incriminating response.*

*Nyflot,* 369 N.W.2d at 516 (emphasis added). Again, logic and credulity seem strained by a conclusion that refusal to test would not be an incriminating response when the crime charged was "refusal to test."

S.Ct. 2292, 81 L.Ed.2d 146 (1984) (other citations omitted)).

My departure from the majority opinion as to McCauley and Driver is compelled by my firm conviction, upon reading the implied consent advisory, that as to these two drivers due process rights under the fourteenth amendment were violated. Generally, due process "comprehends standards of conduct and procedure which accord with fundamental principles of fairness essential to the concept of justice." *State v. Wofford,* 262 Minn. 112, 120, 114 N.W.2d 267, 273 (1962) (footnote omitted). Arguably, consistent with *Neville* and *Nyflot* the state may be under no duty to provide *any* advisory to a driver in the circumstances of the drivers here. However, when the state deems it unnecessary to allow consultation with an attorney before deciding whether to take the test and when, instead, the state arrogates to *itself* the burden of advising a driver, I submit that the idea of fundamental fairness requires the state to give advice that is accurate, that is unambiguous, that is complete enough to meet constitutional requirements, and that avoids prejudice. *See Prideaux v. State,* 310 Minn. 405, 412, 247 N.W.2d 385, 390 (1976) (in dicta the supreme court stated that a driver may reasonably refuse a blood alcohol test "where the officer * * * confused the driver as to his rights"). *See also* the analysis of Chief Judge Wozniak wherein he finds a freestanding right to accurate information.

The statutory advisory given to a driver includes the following:

> (2) that if testing is refused, the person *may be subject to criminal penalties,* and the person's right to drive will be revoked for a minimum period of one year * * *;
>
> (3) that if a test is taken and the results indicate that the person is under the influence of alcohol or a controlled substance, the person *will be subject to criminal penalties* and the person's right to drive may be revoked for a minimum period of 90 days * * *;

Minn.Stat. § 169.123, subd. 2(b)(2)–(3) (emphasis added). Despite the efforts of the majority to interpret the language of paragraphs (2) and (3) in such a way as to redeem the statutory advisory from the fatal consequences of vagueness and confusion, I submit that it is vague and confusing in regard to prosecutions for refusal to test under Minn.Stat. § 169.121; unconstitutionally so. These two paragraphs describe and reference not one offense, but two: DWI and "refusal to test." However, the advisory's language does not make this clear. Hence, the driver is unaware that two separate offenses are involved.

Paragraph 2 addresses the criminal refusal statute and informs the driver that refusal *may* subject him or her to criminal penalties. That warning is wrong for some drivers and inadequate for others. For first-time DWI offenders, it is wrong regarding the refusal statute. First-time DWI offenders will most certainly be subject to the administrative penalty of losing their drivers' licenses if they refuse to take the test. Under the existing statute, however, they *cannot* be subject to criminal penalties for refusing to test. The advisory clearly allows a contrary inference.[5]

The phrase "may be subject to criminal penalties" is a perilously flawed warning for drivers with the requisite prior revocations. They most certainly *will* be subject to criminal penalties if they refuse. McCauley and Driver were, in fact, charged with refusal to test. When drivers who have prior revocations hear that the consequence of refusal to test *may* invoke criminal penalties, and at almost the same moment hear that taking and failing the test *will* result in criminal penalties, they will logically conclude that the more prudent alternative is refusal because it offers an opportunity to escape criminal penalties. Especially if these drivers expect or suspect that a test taken will be a test failed, they will opt to refuse.

While the advisory as now constituted tells the driver that refusal to test will result in a one-year suspension of driving

---

**5.** As noted earlier, in *Moser,* the one case before us that falls into this category, because I find no prejudice, I agree with the majority that license revocation was proper.

privileges, it gives the driver no indication that there is a risk of not one but two criminal prosecutions. There is no indication that for those with prior revocations the very act of refusing the test constitutes a gross misdemeanor offense. Thus, the failure to warn that refusal is a separate offense combined with the logical compulsion to refuse clearly prejudiced *McCauley* and *Driver*. Their decision not to test was based on inherently unclear but statutorily mandated "advice." Where a police officer is required to read to a person, who may have violated one statute, an "advisory" which puts the suspect in jeopardy of violating another statute, that situation does not involve conduct or procedure which accords with "fundamental principles of fairness essential to the concept of justice."

Further, refusal to test is, I submit, precisely the result which should be avoided, both as a public policy measure, and to avoid conflict with the clear rationale of *Neville* which indicates that compulsion to take the test is permissible. *See Neville*, 459 U.S. at 563, 103 S.Ct. at 922 ("Given, then, that the offer of taking a blood-alcohol test is clearly legitimate, the action becomes no *less* legitimate when the State offers a second option of refusing the test, with the attendant penalties for making that choice") (emphasis in original). Because the present advisory logically compels a refusal, it not only violates due process of law, but is constitutionally impermissible under *Neville*.

Additionally, I note that initiation of a DWI prosecution does not require that a driver take and fail a breath test. *See* Minn.Stat. § 169.121, subd. 1(a). There-fore, refusal to test may be admitted as evidence in the DWI proceeding, as well as being introduced as "evidence" in a refusal prosecution. Thus, as written, the advisory's logical compulsion to refuse the test exposes a driver to punishment for an offense which may not otherwise have been committed. The result is that the refusal enticed by the advisory is entered as evidence in the prosecution for the offense which the advisory was supposed to have been designed to prevent. This result is not only ironic, but also an inappropriate introduction of significant prejudice into subsequent proceedings.[6]

While certain pre-amendment cases cited by the majority and concurrences may have allegedly addressed some of the concerns voiced heretofore, I challenge their precedential value as they refer to McCauley and Driver.[7] The advisory used in the cases before us is unique: a qualitative departure from any previous advisory. In one stroke the present advisory attempts to describe and refer to not one, but two, offenses. In *State v. Frank*, 365 N.W.2d 313 (Minn.App.1985), for instance, a case which both the majority and concurring opinions cite, it was appropriate to turn back a constitutional challenge on fourteenth amendment grounds. *Id.* at 314. The refusal to test in *Frank* was to be part of the evidence in a DWI prosecution; not in a prosecution for refusal to test. *Id.; see also State v. Abe*, 289 N.W.2d 158 (Minn.1980).

I do not trivialize the task before appellants in the event the trial courts in *McCauley* and *Driver* are affirmed. When

---

**6.** Few would dispute that prosecution of a DWI charge is made more difficult when no test results are available as evidence. While the rulings in *Willis* and especially *Neville* arguably ease that difficulty, all problems present in the DWI prosecution without a test disappear when a misdemeanor (or gross misdemeanor) DWI prosecution can be replaced by a gross misdemeanor "refusal to test" prosecution with criminal penalties at least as harsh as DWI and the same civil license revocation consequences. Arguments that the present advisory does not compel refusal must be evaluated in view of the advantages gained when the difficult DWI prosecution without a test can be bypassed and the

"refusal to test" charge can be prosecuted instead.

**7.** To the extent that *Deering v. Brown*, 839 F.2d 539 (9th Cir.1988), a test refusal criminal proceeding, may be persuasive, it is also distinguishable. In that case, "[t]he officer told Deering that refusal to take the test constituted a criminal misdemeanor, and further warned Deering that if he did not respond, his silence would be deemed a refusal. Deering remained silent." *Id.* at 541. The defendant in *Deering* was given an explicit and unambiguous advisory which informed him that refusal to test was in and of itself a separate offense.

queried at oral argument about the possibility of administratively revising the implied consent advisory to meet constitutional requirements, appellants unequivocally stated that administrative revision was not permitted. Therefore, a revision appears to require legislative action.[8]

Revision of the statutory advisory will not be an easy task. Nonetheless, to meet constitutional requirements, I believe drivers, if they are to be advised about *anything at all*, should be informed that they are risking two criminal proceedings: DWI *and* refusal to test. The officer need not ascertain whether a driver has a prior revocation. However, the officer must give enough information to permit a driver to know the consequence of refusing the test if he or she does, in fact, have a prior revocation. The officer must also give enough information to permit a driver to know that if this is the first DWI charge, license revocation consequences will be harsh if a test is refused, but there will be no criminal penalties for refusal. Inclusion of information of this breadth would remedy, I submit, the unconstitutionally vague and confusing nature of the present advisory as it applies to those charged under Minn.Stat. § 169.121. Appropriate amendment of the advisory would also result in placing the harsh consequences of test refusal upon those most deserving of them; upon those drivers who persist in continuing to drive while under the influence of alcohol or drugs after they have come through the judicial system on one or more previous occasions.

KLAPHAKE, Judge (concurring in part, dissenting in part).

I concur in the result reached by the majority in *McDonnell* and *Weeding*. I join Judge Lansing's concurrence as to *Moser*. I join Judge Huspeni's dissent as to *Driver* and *McCauley*.

DAVIES, Judge (concurring in part, dissenting in part).

Under the relevant statutory and case law addressing DWI, the police may arrest

a suspected drunk driver, hold the driver in custody, deny the driver an opportunity to consult with an attorney, and then presume to give the driver an "advisory" which must substitute for a lawyer's advice. I find no implied consent precedent rejecting a due process obligation that the state's "advisory" be accurate and nonprejudicial in a circumstance where the state presumes to be counselor to a person it holds in custody.

Judge Lansing's analysis of *Moser* provides, as to all drivers who do not have prior convictions, a wholly satisfactory analysis in terms of prejudice. I concur in that portion of her opinion.

As to drivers with prior convictions, the current advisory is defective in its failure to give adequate warning of the gross misdemeanor liability that results from refusal to take the test. That defect in the advisory becomes prejudicial, however, only when gross misdemeanor *refusal*, is prosecuted. This is the view taken by Judge Huspeni; I join fully in her opinion, adding only that the defects of the advisory can be easily corrected by the legislature—and should be.

RANDALL, Judge, dissenting.

I respectfully dissent and would affirm all five trial courts which for varying reasons threw out the charges against the drivers. I agree with the dissent of Judge Huspeni to the extent that it affirmed the dismissals in the two criminal cases, *McCauley* and *Driver*. I agree fully with the dissent of Chief Judge Wozniak in his discussion of the 14th amendment due process issue relative to *Moser*. But I write separately as I cannot accept the reasoning in the dissents and majority that reverse the trial courts and reinstate the revocations in the civil implied consent cases involving *McDonnell* and *Weeding*.

After examining the facts of the five cases and the interplay between the civil aspect and the criminal aspect, I cannot

**8.** During oral argument, appellants did not specifically cite any authority explicitly prohibiting the commissioner from administratively revising the advisory.

separate the legal analysis as one could before when oral refusals and/or silence were charged out in a civil proceeding. The same implied consent advisory is read to all stopped motorists. No distinction is made between those who face the possibility of a criminal refusal and those who face the possibility of only civil penalties for refusal. With this new refusal crime, the state has so inextricably bound and overlapped civil and criminal refusals that I cannot accept any distinction for the purpose of analysis. I thus examine the trial courts' rulings in favor of all five drivers in light of the constitutional guarantees that the other dissenters, along with myself, attach to the two defendants charged with the crime of refusing testing.

In examining the combined provisions of Minn.Stat. § 169.121, subd. 1a (Supp.1989) and the revised implied consent advisory, Minn.Stat. § 169.123, subd. 2(b) (Supp.1989) (which must be construed together in examining whether a crime has been committed), it is impossible, with honesty and logic, to carve out a civil implied consent refusal from a criminal implied consent refusal. All five cases before us have criminal overtones, and thus I examine each in light of the constitutional guarantees that must be applied when any charge is criminal.

I am in full accord with the other writers who discussed the fourteenth amendment due process issue and found the implied consent advisory at issue confusing, inappropriate, and as to most drivers, *factually and legally inaccurate*.[1] We have an obligation to people who drive vehicles in this state to give them a reasonably clear-cut idea of what is permitted and what is not. The first law of communication is to identify the target group that is to receive the message. The target group here is not scholarly jurists and legal writers pouring over musty articles for publication, but is the basic Minnesota driver stopped on a dark street at 2:00 a.m. who has had three to six beers or two to three mixed drinks (or more), and who needs an honest, understandable advisory before being forced to choose between volunteering information which will be used against him or committing a crime.

Unless the trial courts in these five cases are affirmed, the civil implied consent procedure, which has built into it the specific denial of one's right to consult with an attorney and the specific denial of a *Miranda* warning (whether or not you are in custody and subject to interrogation), will continue into the new law which makes refusing testing, in and of itself, an essential element of a crime under Minn.Stat. § 169.121, subd. 1a. The denial of the protection of a *Miranda* warning and the denial of an attorney is laid out in the implied consent advisory and *Nyflot v. Commissioner of Public Safety*, 369 N.W.2d 512 (Minn.1985). In *Nyflot*, police were advised *not* to give the *Miranda* warning and interrogate arrested drivers until after completing the implied consent portion of the investigation. When refusing to submit to testing was only a civil violation, the "camel" was already staggering under the load of reconciling the Bill of Rights with the gathering of evidence in civil implied consent for use in prosecutions of criminal DWI trials. With this new crime of refusal, I find the camel's back is broken and the fifth amendment guarantee against compelled self-incrimination suffocating beneath a fallen animal. Since mere oral refusal (or just silence) is an essential element of criminal refusal, the conclusion is inescapable that a driver must have the full *Miranda* warning and its attendant right to an attorney before answering whenever he is the subject of such interrogation.[2]

---

1. When the several thousand stops made annually in the State of Minnesota are examined, it is clear that *Moser*, by far, represents the average driver stopped. Although chronic drinking drivers do a disproportionate share of damage, it still remains that only a small percentage of drivers stopped will have on their record the necessary priors so that their refusal is not civil but criminal. Thus, I support Chief Judge Wozniak's vigorous and cogent argument and point out that the problem he addresses will be present, not just in isolated cases, *but in virtually all*.

2. While noncustodial interrogation does not trigger the right to a *Miranda* warning, the fact of custody or not does not impact on the fifth amendment prohibition against compelled testimony. That constitutional guarantee exists in all citizens at all times, not just when in custo-

Even while arguing against this conclusion, the state concedes it.

At oral argument, the Apple Valley City Attorney admitted that he recognized the constitutional problem with the refusal law at issue because making refusal a crime should require a *Miranda* warning before questions to a driver about his prior record (an essential element of criminal refusal) could be asked. The city attorney was responding to a direct question from the panel as to why the advisory could not be preceded by questions to the driver to ascertain if the driver was a "first timer" (which would mean refusal could only be civil) or a subsequent offender (which would mean the officer had a possible criminal suspect). The following questions and answers took place verbatim:

Q. On behalf of the Commissioner you appeared to concede that if an essential element of the crime were elicited, namely priors, in response to a direct question * * * a *Miranda* warning should precede it, weren't those your exact words?

A. They were.

Q. That would be an, that since a person is under arrest, it would be better from a constitutional standpoint to give a *Miranda* warning if you get into the essential elements, correct?

A. Correct.

* * *

Q. Are there other elements to the crime such as refusing to take the test, is that an element of the crime:

A. *Of course, yes. Refusing to take the test is an element of the crime* * * *.

(emphasis added).

I analyze the fifth amendment issue as follows. The underpinning of civil implied

consent procedure in Minnesota and other states is the Supreme Court case of *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). An examination of *Schmerber*, 384 U.S. at 763, 86 S.Ct. at 1831 shows clearly it was *not* some kind of breakthrough case which carved out a heretofore unknown exception to the fifth amendment, but was nothing more than a restatement of an old United States Supreme Court "present your body" case, *Holt v. United States*, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910). In *Holt*, Justice Holmes said:

> The prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to exhort communications from him, *not an exclusion of his body as evidence when it may be material.*

*Id.*, (citing *Holt*, 218 U.S. at 252–53, 31 S.Ct. at 6) (emphasis added). That is what *Holt* and *Schmerber* said. That is all *Holt* and *Schmerber* said. *Holt* involved the question of whenever a defendant could be compelled to display a particular item of clothing in front of the jury. With common sense and logic, Justice Holmes pointed out that arguments to the contrary could only lead to the unacceptable conclusion that defendants could not even be compelled to sit in the courtroom for juries to look at and compare his looks to a photograph or other description supplied by the witnesses. *Holt*, 218 U.S. at 253, 31 S.Ct. at 6. *Holt* found that a defendant could be compelled to display himself to a jury without offending the fifth amendment. From *Holt* arose a line of cases allowing the state to escape the prohibition of the fifth amendment against compelled testimony when it only

---

dy. Thus, for fifth amendment purposes, we need not distinguish the roadside stops where the interrogation is to a driver not in custody from those stops where arrest and custody take place before interrogation begins. The question of custody only triggers the necessity for a *Miranda* warning. The necessity to respect the fifth amendment is always present. Also, the fifth amendment defect of the refusal as crime statute can not be cured by requiring a *Miranda* warning be given prior to the implied consent advisory. Making the act of refusal (or the

exercise of the right to remain silent) a crime makes the long treasured right to remain silent an illusory one. Even with the procedural warning of *Miranda* given and even if an attorney is available, the driver has no real choice. If he waives the right he provides evidence against himself, and if he invokes his *right to silence* the statute makes this exercise of constitutional protection a crime. Minn.Stat. § 169.121, subd. 1a is so contrary to the guarantees of the fifth amendment it is fundamentally flawed.

wanted to compel defendants to "present their body." Defendants can be compelled to give fingerprints, handwriting samples, voice samples, hair samples, height and weight measurements, et cetera. *Schmerber*, 384 U.S. at 764 n. 8, 86 S.Ct. at 1832 n. 8. The majority in *Schmerber* (over strong and articulate dissents) allowed the forcible extraction and analysis of blood to pass the fifth amendment question on the same theory as *Holt*. *Schmerber*, like *Holt* was merely being required not to exclude his body from examination. But so as not to choke on their stretched and extended reasoning, the *Schmerber* majority carefully reiterated the principles enunciated by Justice Holmes in *Holt* regarding the fifth amendment forbidding the use of physical or moral compulsion *to extort communication* from defendants to use against them in criminal cases. *Id.* 384 U.S. at 763, 86 S.Ct. at 1831. The *Schmerber* court definitively and vigorously preserved the historic privilege against self-incrimination when what was wanted by the state was evidence of a testimonial or communicative nature.

> History and a long line of authorities in lower courts have consistently limited its [fifth amendment] protection of situations in which the state seeks to submerge those values by obtaining the evidence against an accused through the *cruel simple expedient of compelling it from his own mouth.* * * * In some the privilege is fulfilled only when the person is guaranteed the right to remain silent unless he chooses to speak in the unfettered exercise of his own will. The leading case in this court is *Holt v. United States*, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021.

*Schmerber*, 384 U.S. at 762–63, 86 S.Ct. at 1831 (emphasis added).

I submit that *Schmerber* stands four-square against Minnesota's refusal law because *the communication of the refusal is the crime.* Minnesota's crime of refusal is not a "present your body" case. The essence of refusal is the communication from your own mouth of an assertion of a fact, namely that you will not take the test. This crime of refusal *has nothing to do with the driver's body.*[3]

The crime we examine here rests on the communication by the driver of a refusal to take a test. End of report. This refusal crime has no relationship to *Holt* or *Schmerber*. Previous exceptions carved out for allowing the state, for instance, to compel handwriting or voice samples are situations where *the "contents" of the samples were irrelevant.* With handwriting, the state wants evidence of *how* a defendant writes, not *what* he writes. A defendant cannot be compelled to write a confession, but can be compelled to write "a quick red fox jumps over a lazy brown dog" so his handwriting can be analyzed. A defendant cannot be compelled to orally confess, but, for instance, can be compelled to recite that section of the Declaration of Independence[4] wherein he is guaranteed life, liberty, and the pursuit of happiness, not because the authorites are interested in examining the contents of that wonderful document, but because they want to hear him talk out loud to examine characteristics of his voice. In the case at bar, the state does not care whether the drivers have a husky voice, lisp, or have a head cold. The state is interested only in the communication of the contents of the answer, i.e., yes or no. I submit this is precisely the act prohibited by the fifth amendment of the Bill of Rights as discussed in *Holt* and *Schmerber*.

Although state and federal courts agree that the incidents of drunken drivers is of grave concern, the recent addressing of

---

**3.** Should the driver refuse to take a test, yet subsequently change his mind and submit his body for a breath, blood, or urine sample, it would be totally irrelevant and nonprobative on the crime of refusal. In my opinion, under the refusal statute, it would not even have to be considered by the court as a mitigating circumstance when it came time to pronounce sentence.

**4.** We hold these truths to be self evident that all men are created equal, that they are endowed by their creator with certain unalienable rights, that among these are life, liberty and the pursuit of happiness.

this issue by the United States Supreme Court in *Pennsylvania v. Muniz,* — U.S. ——, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) is instructive, as it should put to rest any inference that the fifth amendment goes underground and takes a vacation when the crime is driving while intoxicated. In *Muniz,* a defendant suspected of the crime of driving while intoxicated had been arrested and booked. During the booking procedure, Muniz was asked questions concerning his name, address, height, weight, eye color, date of birth, and his current age. On these questions the majority found that, although he was in fact the subject of custodial interrogation, there was no need for a *Miranda* warning, nor was the attendant right of having an attorney present needed, as these were routine administrative booking questions. Routine booking inquiries serve as an exception to the strict rule that a full and complete *Miranda* warning must precede custodial interrogation before testimonial evidence can be obtained from and used against a defendant. *However,* Muniz was asked an eighth question, namely, the date of his sixth birthday. Muniz, an adult, had trouble with that answer. The majority in *Muniz* suppressed that answer on fifth amendment grounds with the reasoning that the testimonial nature of his hesitant and sloppy answer to a question that should have been answered easily would communicate to the factfinder evidence of an impaired mind, and evidence of an impaired mind is evidence of being under the influence, and being under the influence of alcohol is an essential element of the crime of driving while under the influence of alcohol.[5]

The *Muniz* court thoroughly discussed *Schmerber; Doe v. United States,* 487 U.S. 201, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1987),

(A testimonial communication is one which explicitly or implicitly relates a factual assertion or discloses information, and the vast majority of statements, oral or written, will be testimonial and there will be few instances where a statement will not convey information or assert facts); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), (The fifth amendment protection against compelled self-incrimination includes formal and informal compulsion, and procedural safeguards are required even in custodial pretrial interrogations and interviews); *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), (While the state may compel an accused to read a transcript aloud, it may be only for the purpose of obtaining a voice exemplar to measure the individual properties of the accused's voice, and it may not be used for the testimonial content of the transcript); and other seminal cases. After a lengthy analysis, the *Muniz* majority determined that the fifth amendment to the Bill of Rights protected Muniz and surrounded him with the full panoply of the United States Constitution when he was asked "Do you know what the date was of your sixth birthday?" *Muniz,* — U.S. at ——, 110 S.Ct. at 2649. The *Muniz* court explicitly reiterated the holdings of *Schmerber* and *Holt* that the fifth amendment privilege protects the accused from having to provide the state with evidence of a "testimonial or communicative nature." The *Muniz* court held that in order to be testimonial, an accused's "communication must explicitly or implicitly, *relate a factual assertion or disclose information." Muniz,* — U.S. at ——, 110 S.Ct. at 2643 (emphasis added).

It would raise naivete to an art form to argue that when a driver in Minnesota is asked whether he or she will submit to a

---

5. It was not the fact of when Muniz's sixth birthday was but the incriminating inference which could be drawn from the contents of his speech in attempting to answer the question which fell under the protection against compelled self-incrimination. This is precisely the nature of the case at bar. By making the refusal of testing criminal, the refusal being an essential element of the crime, applying the Supreme Court's *Muniz* analysis make a refusal (or si-

lence) tantamount to testimony. Further, I adopt Judge Huspeni's analysis in her dissent which shows the statute compels a refusal. The majority relies on *Deering v. Brown,* 839 F.2d 539, 541–542 (9th Cir.1988) to find a refusal would not be testimonial. In light of the United States Supreme Court's thorough analysis in *Muniz,* a later case than *Deering,* I find *Muniz* persuasive and controlling.

test that the answer "no" is neither a factual assertion nor the disclosure of information. The *Muniz* court went on to carefully distinguish (and thus allow in as evidence) the "slurred nature" of Muniz's answer, likening it to a forced voice exemplar for tonal quality, but found that Muniz's oral communication of the wrong date was over the line and thus entitled to fifth amendment protection. That protection not being present necessitated suppression of "the birthday answer." The Supreme Court found Muniz's incorrect answer to the question incriminating *not because of the tonal quality of his voice but because of the communication and testimonial inference which could be drawn from his answer. See Muniz,* —— U.S. at ——, 110 S.Ct. at 2645–47.

The Minnesota refusal law cannot be distinguished. The state is not looking for the physical properties of the driver's oral answer as in *Dionisio,* but is only concerned with the inferential content of the driver's answer, i.e., is it a yes or a no.

In *Muniz,* the United States Supreme Court clothed a driver suspected of operating a vehicle under the influence with the Bill of Rights, including the requirement of a *Miranda* warning and the presence of an attorney, if he chose, to answer the hardly life-threatening question of what was the date of his sixth birthday. The futility of attempting to distinguish our refusal law from *Muniz* is shown by the fact that Minnesota's refusal law is far more direct, and thus, under the reasoning of *Muniz,* even more subject to being struck down. No one argued in *Muniz* that by failing to give the correct answer to his birthday question Muniz broke any law. In fact, there is not even a guarantee that in a later trial for the crime of drunk driving the jury would even find his stumbling over the answer to be of any evidentiary consequence. A jury could give it some weight, but would not have to give it any weight. In other words, just on the bare possibility (a pure speculation in effect) that a jury might find the contents of Muniz's answer about his sixth birthday to be communicative and testimonial that might aid in finding him guilty of DWI was enough for the

United States Supreme Court to call that question one subject to the mandates of the fifth amendment and a *Miranda* warning.

Now, contrast Minnesota's law of criminal refusal wherein the answer "no" itself is part of a crime, alongside the innocuous question asked *Muniz,* and try to argue that Minnesota's refusal law is exempt from fifth amendment prohibitions spelled out in *Muniz.* If we were to stop the average Minnesota resident on the street to inform him that the Constitution of the United States protects his right not to guess at the date of his sixth birthday without a *Miranda* warning and the aid of an attorney but does not protect his having to answer a direct question from the authorities wherein a negative answer (or silence) is a crime in and of itself, will likely lead that citizen to pick up a rock, walk to a courthouse, and throw the rock at it believing he "need not suffer fools." I submit we cannot argue a distinction between Muniz's rights and a Minnesota driver's rights with a straight face and keep faith with our citizens.

It is interesting to note that even before the present refusal law, and back when all implied consent was civil, Minnesota held that the admission into evidence of a driver's refusal to submit to testing in a criminal prosecution violated the privilege against compelled self-incrimination pursuant to the federal fifth amendment and the Minnesota Constitution Article I, Section 7. *State v. Andrews,* 297 Minn. 260, 212 N.W.2d 863 (1973), *cert. denied* 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974). Since that time the Minnesota Supreme Court, with repeated opportunities to do so, has studiously avoided overruling *State v. Andrews.* It is good law today.

In *State v. Willis,* 332 N.W.2d 180 (Minn. 1983), the Minnesota Supreme Court deliberately allowed *Andrews* to remain even though three members of the court in a concurring opinion would have overruled *Andrews* based on *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). I would note that recently the Minnesota Constitution was again interpreted to give more rights than

the United States Constitution.[6] Minnesota, like all states, is only prevented from giving less.

In examining this criminal refusal law, we do not need to follow *Neville* as it does not control the issue. *Neville* only discussed the use of one's refusal in a criminal case when that refusal was gathered as evidence in a civil case. *Neville* did not in any way approach the precise question before us, which is, what does the fifth amendment say and what does it prohibit when the refusal itself is the crime.

This new crime of refusal presents another problem unique in Minnesota and not touched on in any way in *Schmerber* and *Neville*. That is what I call the "*Nordstrom* issue." In *State v. Nordstrom*, 331 N.W.2d 901 (Minn.1983), the Minnesota Supreme Court held:

> Absent [a] valid waiver on the record of a defendant's right to counsel, the misdemeanor DWI conviction based on an uncounseled plea of guilty cannot be used as the basis of a gross misdemeanor charge.

*Nordstrom*, 331 N.W.2d at 905. For some time now, Minnesota has had a law allowing the enhancement of your basic misdemeanor DWI into a gross misdemeanor if it is "two in five or three in ten." Minn.Stat. § 169.121, subd. 3a (1989). What the *Nordstrom* court said in essence was, although you had a prior misdemeanor on your record, that prior misdemeanor could not be used to enhance a second misdemeanor into a gross misdemeanor unless the record showed that the conviction for the first misdemeanor was based on a scrupulous adherence to the right to counsel. The *Nordstrom* court called for this scrupulous adherence even though *Nordstrom* was in a setting where the threshold, the first violation, was a crime, not a civil violation, and thus presumably constitutional safeguards were present at that first violation.

There can be no such presumption with our criminal refusal statute that constitutional safeguards were scrupulously adhered to in the threshold proceeding because the threshold proceeding could be a prior *civil* revocation. Civil revocations are found in a proceeding without the constitutional guarantees of a jury trial, an attorney, the presumption of innocence, and the state's burden is a mere preponderance of the evidence rather than proof beyond a reasonable doubt. If the Minnesota Supreme Court was so concerned in *Nordstrom* about constitutional rights that you could not enhance, even when based on a prior crime of record, unless, in addition to that crime being of record, there was explicit in the record evidence that the right to counsel has been protected, what do we do with the concept of enhancing into a gross misdemeanor a prior civil implied consent violation which, by definition, is not surrounded with the constitutional guarantees afforded Nordstrom when he had his first DWI? I do not rest my analysis in this dissent on the *Nordstrom* issue, but only mention it to emphasize the extraordinary care and concern Minnesota has for the protection of its citizens' rights.

I note the majority mentions the public policy argument of liberal interpretation citing *Szczech v. Comm'r. of Public Safety*, 343 N.W.2d 305 (Minn.App.1984) and *State, Dep't of Public Safety v. Juncewski*, 308 N.W.2d 316 (Minn.1981). I do not disagree that the words used in *Szczech* and *Juncewski* are what the majority say they are, but I disagree with the majority's position that they are relevant. I read in *Szczech* and *Juncewski* (whether the violation was civil implied consent or the use of such evidence in a DWI prosecution) the implicit statement that in *civil* implied consent proceedings the statutes are remedial and should be given a broad effect. I cannot accept any inference that the liberal

---

**6.** In short, we interpret the Minnesota Constitution as requiring a more stringent burden on the state in our opinion and grants far more protection of religious freedom than the broad language of the United States Constitution. Pursuant to this analysis, we conclude that the state has failed to sustain its burden in demonstrating a sufficiently compelling interest. *State of Minnesota v. French*, 460 N.W.2d 2 (Minn.1990).

interpretation in civil revocation cases can apply to the crime of refusal or, for that matter, any other crime.

Minnesota, when it comes to the interpretation of criminal statutes, construes criminal statutes strictly against the state and in favor of the accused. *State v. Soto*, 378 N.W.2d 625, 627–28 (Minn.1985). I know of no exceptions to this rule ever carved out, for instance, for murder, sexual assault, or robbery, all serious felonies. I submit a close examination of the law will show that none has been carved out for traffic offenses. The disagreement I have with the majority over the interpretation to be given cases that discuss interpreting driving laws underscores the problem created here when civil implied consent refusal is now elevated to an unholy alliance with criminal refusal. Laws are not supposed to be "a trap for the unwary." Refusal as a crime, and its attendant implied consent advisory, are not just a trap for the unwary motorist, they are a morass for the bench and bar.

Lastly, I note that not only do I find the duo of Minn.Stat. §§ 169.121, subd. 1a and 169.123, subd. 2(b) in combination thereof unconstitutional, I find, worst of all, that they are of no use for the legitimate purpose for which they were intended, meaning the lessening of the incidents of impaired driving. We are, at heart, a bottom line nation. If there were any indicia that changing civil implied consent to criminal implied consent and enhancing the already severe penalties would do any good, I suspect winking at the fifth amendment might be easier. However, I know of no study that indicates or even begins to imply that drivers in Minnesota thought the previous combination of misdemeanor DWI, gross misdemeanor DWI, and civil implied consent with the attached expenditures of thousands of dollars for legal fees and increased insurance costs, the possibility of days to several months in jail, and the possibility of hundreds of dollars in fines was a "piece of cake." Now that we have yet another gross misdemeanor on the

books, why do we assume that repeat offenders will get religion, vow to amend their ways, and now, for the first time, take seriously laws against driving while intoxicated?

Not only do I find violations of the fifth, sixth, and fourteenth amendments to the Constitution, I suggest it is all for naught as the state now imposes on itself a higher burden to get convictions. When refusal to test, whether for the first, second, or third time, was civil, the burden of proof by the state was a preponderance of the evidence. There was no right to a jury trial, and the problems of proof for the state were few and avenues of defense for drivers were fewer. Now, when refusals are prosecuted as a crime, the drivers will be entitled a trial by jury, will be clothed with a presumption of innocence, the right to counsel will be enforced, and the state will be held to the highest burden of proof we have, proof beyond a reasonable doubt.

Leave implied consent refusals a civil matter. As a civil proceeding, they are workable and enforceable. I submit that as a separate crime, refusals are neither. I suggest the logical place to attack the problem of driving while intoxicated is at the source, namely, separate the drinker from his/her car. No driver has a constitutional right to drive impaired, not even to a slight degree. Yet, once you drive impaired, are lawfully arrested and lawfully charged with a crime, then the array of federal and state constitutional rights for the accused is set in motion. These guarantees, in all cases, to some degree, impede prosecution, and in some cases prevent a successful one. Better to attack the problem by separating drunken drivers from their vehicles rather than sitting back until there has been an arrest and a criminal complaint, and then attempt to carve out exceptions to the Bill of Rights because of "carnage on the highways" caused by drunks. Carnage on the highways, and all other crimes, are subservient to the carnage at Valley Forge, Yorktown, and Gettysburg where the civil liberties now hang-

ing in the balance were carefully shaped and hammered into rights so ·clean and so pure that they stand the test of time and resist encroachment.

I dissent and would affirm the trial courts across the board on these five cases.

PARKER, Judge (dissenting).

I join in Judge Randall's dissent, both as to analysis and rhetoric.